UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIEL J. QUIROZ,<br><br>           Plaintiff,<br><br>    v.<br><br>KILOLO KIJAKAZI, acting<br>Commissioner of Social Security,<br><br>           Defendant. | No. 1:22-cv-01215-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ARIEL QUIROZ AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**<br><br>**(Doc. 17, 19)** |

**I.**    <u>**Introduction**</u>

Plaintiff Ariel Quiroz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is before the Court on the parties' briefs.[1] Docs. 17, 19, 20. After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.

**II.**    <u>**Factual and Procedural Background**</u>[2]

On May 15, 2020 Plaintiff applied for supplemental security income alleging a disability onset date of June 10, 2014 (which was subsequently amended at the hearing to May 15, 2020, the application date). The Commissioner denied the application initially on June 26, 2020 and on reconsideration on September 11, 2020. Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on February 24, 2021 with a supplemental hearing on July 1, 2021. AR 66–88. On July 27, 2021 the ALJ issued an unfavorable decision. AR 17–33. The Appeals Council denied review on July 28, 2022. AR 1–7.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 8 and 21.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized. Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

### III. **The Disability Standard**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.     The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of May 15, 2020.  AR 22.  At step two the ALJ found that Plaintiff had the following severe impairments: seizure disorder, migraines, status-post right knee arthroscopy, anterior cruciate ligament reconstruction, and partial lateral meniscectomy.  AR 22.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 23.  V

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 416.967(c) with frequent postural activities and environmental restrictions.  AR 24–26.

At step four the ALJ concluded that Plaintiff had no past relevant work.  AR 26.  At step five the ALJ concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform: dining room attendant, linen supply room worker, and stock selector.  AR 27.

Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her application date of May 15, 2020.  AR 28.

## V.  Issues Presented

Plaintiff asserts two claims of error: 1) The ALJ failed to include work-related limitations in the residual functional capacity consistent with the nature and intensity of Plaintiff's limitations, and failed to offer any clear and convincing reasons for rejecting Plaintiff's subjective complaints and testimony; and 2) that the Appeals Council erred in concluding that the new evidence Plaintiff submitted after the ALJ hearing did not present a reasonable probability that the outcome would have been different had the ALJ considered the evidence.

### 1.  RFC; Testimony

#### A.  Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective

---

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

4

medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10. Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

### B.    Analysis

Plaintiff contends the ALJ "failed to provide clear and convincing reasons for discounting Plaintiff's testimony regarding her headaches, seizures, and cognitive limitations." Br. at 11, Doc. 17. Specifically, Plaintiff argues: 1) with respect to her migraines, the ALJ observed that Plaintiff testified she was prescribed Topamax which she did not take, but the ALJ did not otherwise address Plaintiff's testimony concerning her migraines or any related limitations; 2) that the ALJ improperly relied on one treatment note from January 2021 to conclude Plaintiff's seizures were controlled by implantation of a vagal nerve stimulator (VNS), at the expense of another treatment note from April 2021 that suggests otherwise; 3) that evidence submitted to the Appeals Council contradicts the ALJ's conclusion that the VNS controlled her seizures;[4] 4) that the ALJ omitted any discussion of Plaintiff's cognitive limitations (specifically as to memory) as evidenced by her testimony and a September 2020 neuropsychological exam; and 5) that the ALJ's findings with

---

[4] Which is separately addressed in more detail below at section V.2

respect to Plaintiff's activities of daily living (ADL) ignored the pertinent detail and context about some of the activities in question (swimming), cited others outside the relevant period (jogging), and cited additional activities that did not suggest an ability to sustain employment. Br. at 11–17, Doc. 17.

Defendant responds that: 1) the ALJ appropriately found Plaintiff's testimony about seizure frequency (seizures every month and grand mal seizures every three months) and knee pain inconsistent with the objective evidence which showed: a) an EEG study which showed normal motor, sensory, and cerebellum, with seizure activity detected only on a 40 hour study after the stoppage of medication, b) that the evidence showed "good seizure control" prior to medication stoppage, c) that Plaintiff's headache pain was reportedly responsive to ibuprofen 800, d) that the Plaintiff reported she was "doing well" after VNS implantation with minimal seizure activity thereafter, and e) that she exhibited good strength, range, and gait pattern after knee surgery with all physical therapy goals met and minimal reported symptoms; **2**) that the ALJ appropriately found Plaintiff's complaints undermined by her daily activities, including: three hours of daily online college classes, swimming, jogging, ability to lift a 45 pound child, folding laundry, preparing simple meals, grocery shopping, drawing, and painting; **3**) that the ALJ appropriately founding Plaintiff's migraine headaches did not meet a Listing and Plaintiff does not cite any evidence to the contrary or establish that her headaches required a more restrictive RFC; and **4**) that the Appeals Council appropriately declined to exhibit new evidence submitted after the ALJ hearing, namely a one page letter from Nurse Practitioner Bradley, evidence which did not present a reasonable probability that the outcome would be different had the ALJ considered the letter. Resp. at 13–21, Doc. 19.

It is worth noting that the RFC analysis here was roughly 2.5 pages, which is unusually brief particularly given the 1,130 page administrative record.

The RFC analysis here can be reduced to roughly 8 substantive paragraphs:

With regard to treatment, the claimant testified that she takes Topamax for migraines but later testified that she does not do so. The record reflects that this medication was prescribed at a January 2021 visit (Id. at 3). She also takes seizure medication every day. She has seizures that present as staring, twitching and a grand mal seizure about once every three months but still manages to attend her classes and do her schoolwork. When the claimant has a seizure, she testified that she rests with a pillow over her head. The claimant sees neurologist Raymund David, MD who prescribes her seizure medication. She also saw Zachary Wright, MD for placement of a vagal stimulator (Id. at 1). The record shows that she takes Ibuprofen for pain. The record also shows she was treated by Trisha Beck, MD and at Community Medical. In January 2020, the claimant failed to show up for physical therapy three times and had six cancellations (Exhibit 5F/11). Recent records show that the claimant resumed her physical therapy and was discharged in June 2021 after meeting all of her physical therapy goals (Exhibit 10F/157). The claimant was prescribed a shower chair that she uses (Exhibit 9F/13, 17).

With regard to daily tasks, she is able to fold laundry, prepare simple meals and go grocery shopping. She uses a computer for her homework and to attend online classes. She draws for two to three hours a day, and enjoys painting in watercolors and oils. The claimant spends time with her siblings. She enjoys swimming in the pool, the lake and the river with her siblings. In January 2020, the record indicates she was jogging (Exhibit 1F/41). She reinjured her knee playing football in April 2021 (Exhibit 10F/162) and playing softball in July 2018 (Exhibit 7F/41). She testified that she is able to lift and carry approximately forty-five pounds, which is the weight of her youngest sibling. The evidence supports a limited range of medium work with postural and environmental limitations.

. . . [boilerplate language finding claimant's statements not entirely consistent with the record for the reasons explained in this decision]

The record shows that the claimant has a history of significant treatment concerning her right knee due to several sports injuries . . . [description of knee surgeries]

. . .

Post-surgically, the claimant has regained much of the function concerning her right knee . . . [unnecessary detail about post-surgical records predating the May 15, 2020 application date, and thus outside the relevant period]

. . .

Since May 15, 2020, the application date, the medical evidence suggests that the claimant has demonstrated minimal signs or limitations concerning her right knee. For instance, a treatment visit from August 11, 2020, shows that the claimant had been swimming all summer (Exhibit 2F/5). The claimant indicated that she was considering playing softball in college at a September 2020 visit (8F/17).

7

> During the early part of 2021, the claimant underwent another course of physical therapy when she twisted her knee exiting her car (Exhibit 10F/182). A note from February 2021 noted that the claimant's pain had diminished and she had improved range of motion and strength (*Id.* at 178). During April 2021, the claimant again reinjured her knee playing football (*Id.* at 162). However, a discharge note from June 2021 reflected that the claimant had met all goals and had only mild residual symptoms with high impact activities (*Id.* at 157).
>
> In addition to this treatment concerning the right knee, neurologist, Raymund David, MD, has provided treatment for seizures and migraines. At a June 2020 visit, the claimant reported that she was experiencing seizure episodes approximately once a month despite taking three seizure medications—lamotrigine, levetiracetam, and Zonegran at almost maximum doses (Exhibit 3F/10). A July 2020 EEG was abnormal due to the presence of generalized epileptiform activity (*Id.* at 19).
>
> These symptoms have been addressed surgically. Specifically, on November 9, 2020, the claimant had a vagal nerve stimulator surgically placed by Zachary Wright, MD (Exhibit 8F/11). Since placement of this device, the claimant has had minimal symptoms. A follow-up note from January 2021 reflected that she was doing well (*Id.* at 1). In fact, she only reported an episode of hand shaking during Thanksgiving that resolved when the nerve stimulator was activated (*Id.*)
>
> . . .
>
> The opinions prepared by the State agency consultants [that claimant is limited to light exertional work]. . . are not persuasive . . . [duplicative discussion of knee improvement following surgery] The claimant has also engaged in demanding activities including swimming, jogging, and playing softball (Exhibits 1F/41; 2F/5; 10F/162).
>
> Given the above, I have limited the claimant to a reduced range of medium work with postural limitations. These provisions acknowledge objective signs observed on clinical testing concerning her right knee as well as the possibility of continuing symptoms despite treatment. Additionally, I have included environmental limitations given evidence of seizures despite indications that these issues have largely resolved following placement of a vagal nerve stimulator.

AR 24–26.

With respect to Plaintiff's headaches, Plaintiff is correct that the ALJ essentially made no findings. The Commissioner responds that the ALJ appropriately found she did not meet a Listing, and that Plaintiff does not establish otherwise, but this reply is non-responsive. Moreover, Plaintiff did not contend she meets a Listing. The ALJ's corresponding discussion of the Listings at step

three also did not contain any substantive discussion to fill in the blanks at the RFC stage. The step three finding was simply an assertion, without elaboration, that there is no Listing for primary headache disorder and there is no evidence her impairments in combination met or equaled listing 11.02 for dyscognitive seizures. AR 23.

The Commissioner further responds that "Despite *the ALJ's findings* that Plaintiff treated her migraines *conservatively* with medication and Ibuprofen, *which was helpful* (Tr. 24, 722), Plaintiff has not met her burden in showing that because of her headaches or seizures she required a more restrictive RFC." Resp. at 13 (emphasis added). However, the ALJ made no such findings expressly or by reasonable implication in the RFC analysis or anywhere else in the decision. The ALJ observed unremarkably that Plaintiff was prescribed Topamax (which she may not have taken as prescribed), and that she also takes ibuprofen for pain. AR 24.

In the same paragraph, the ALJ made additional observations without elaboration, including that Plaintiff failed to show up for three physical therapy appointments and had six cancellations. *Id.* The observations regarding Topamax, ibuprofen and PT now-shows seemed to foreshadow findings about a conservative treatment regimen and/or treatment noncompliance, but the ALJ made no such findings. To facilitate meaningful judicial review, and to put Plaintiff on notice of what issues she must litigate in her opening brief, the ALJ needed to formally take a position on these matters.

The page Defendant cites does state that "she has headaches every day. Sometimes she will have worse headaches that last 2 days. Ibuprofen is helpful if she takes it early and has to take 800mg." AR 722. Stating ibuprofen is "helpful," is somewhat non-specific and the full statement had accompanying disclaimers. She was also prescribed a prophylactic (Topamax). She testified it was not helpful (AR 48) and reported the same to her doctor (AR 1114). Neither the ALJ nor the Commissioner cite evidence to the contrary. Even assuming the statement in the cited record is

sufficient to rebut her testimony that she has "major" daily headaches, which can last up to two days, require her to lay down, and which are not alleviated by ibuprofen or Topamax[5] (AR 47, 48, 51, 722), the ALJ would have to provide some modicum of related factual findings or analysis to which the Court could defer.

With respect to her knee impairment, Plaintiff does not directly dispute the ALJ's findings that she demonstrated normal strength, range, and gait with minimal residual limitations following her knee surgeries (including after her re-aggravation). *See* Br. at 11. Doc. 17 (asserting the ALJ "failed to provide clear and convincing reasons for discounting Plaintiff's testimony regarding her *headaches, seizures, and cognitive limitations*." (emphasis added)).

At best, Plaintiff disputes the ALJ's finding that her daily activities support a medium exertional RFC, activities which Plaintiff contends the ALJ took out of context (such as swimming). This issue will be discussed in more detail below to the extent the ALJ cited the ADLs as generally inconsistent with Plaintiff's alleged limitations. It is noted however that Plaintiff does not discuss or analyze testimony or other evidence which suggests her knee impairment continues to present an obstacle to her performing exertional activities.

With respect to her seizures, the ALJ found that these largely resolved following implantation of the VNS on November 9 2020 with minimal symptoms thereafter.[6] The ALJ relied on a January 6, 2021 examination at which she reported "doing well" post-operatively (Exhibit

---

[5] Granted, Plaintiff did not put forth much effort in marshalling this pertinent evidence (i.e. the "subjective testimony" in question) in her argument, but opted for more of a generalized critique of the ALJ's reasoning as if her testimony created a rebuttable presumption of disability for the ALJ to overcome. But Plaintiff did cite and describe the pertinent evidence in her factual summary, which is more than what the ALJ did-- whose RFC analysis again was only 2.5 pages including the statement of law, recitation of facts, and analysis, which, as stated above, was inadequate to cover an 1,100 page record concerning a myriad of impairments including migraines, myoclonic seizure disorder, and knee impairment status post arthroscopy, ACL repair, and meniscectomy.

[6] Even if this finding was supported, it would not rule out a closed period of disability between the application date of May 15, 2020 and the VNS implantation date of November 9, 2020, which the ALJ did not consider. The Ninth Circuit has recently emphasized the importance of considering how a claimant's symptoms change over time. See, *Smith v. Kijakazi*, 14 F.4th 1108, 1116 (9th Cir. 2021) (finding the ALJ "erred by seeking only to reach a single disability determination for the entire multi-year period, thereby failing to consider whether Smith was disabled for only a qualifying, early portion of that time.").

8F/1), with one reported episode of hand shaking during Thanksgiving that resolved when the nerve stimulator was activated (Id.).

Before referring to the cited record, "doing well" post-operatively is a colloquialism meaning there were no complications from the procedure. It is not tantamount to an assertion that the underlying impairment of myoclonic seizure disorder has resolved or abated. Indeed, turning to the ALJ's pin citation the words "doing well" were quoted in isolation without the remainder of the sentence or surrounding discussion which reads as follows:

> Ariel is a 20-year-old woman who presents in follow up status post placement of VNS. She has been doing well without any *fevers chills sweats or problems with the incision. The soreness around her incisions has resolved* however she does notice a funny feeling in her throat and a change in her voice when the device is working. She had an episode of hand shaking over Thanksgiving that resolved after she used a magnet to activate the VNS.

AR 721 (emphasis added).

Even assuming "doing well" was in reference to efficacy of the VNS, and that the Thanksgiving hand shaking episode was the only seizure between the date of the VNS implantation and the date of the follow up, the ALJ's inference that the condition was well controlled after the implantation does not necessarily follow. The follow-up visit quoted above from January 6, 2021 was less than two months after the procedure on November 9, 2020. Plaintiff also cites a treatment note from April 25, 2021 which states, "She typically has a GTC[7] about once a month, but has small myoclonic jerks on an almost daily basis." AR 1114. It further notes that "high-dose Keppra and Lamictal and by report with the addition of VNS her seizures have been *better controlled*." AR 1115 (emphasis added). But being "better-controlled" does not mean "largely resolved" as the ALJ found. Further, the ALJ did not cite or discuss the April 2021 treatment note. Defendant is correct that affirmance is appropriate where the record supports two conclusions. But that principal

---

[7] General Tonic-Clonic (GTC), also known as a grand mal seizure.

11

applies with much less force when the ALJ only cites the records that support the ALJ's conclusion. This suggest the ALJ was either unaware of, or chose not to consider, the evidence on both sides of the issue, resolve the conflict, and reach a reasoned conclusion. Remand is appropriate therefore for the ALJ to do so.

Plaintiff further contends the ALJ ignored evidence regarding her cognitive limitations as reflected in a September 2020 neuropsychological exam which documented: a) word finding difficulties and latent response throughout the examination, b) verbal linguistic reasoning of borderline range, c) immediate and delayed memory below the 1st percentile, and d) delayed recognition below the 2nd percentile. (AR 743). Defendant emphasizes the ALJ's reliance on countervailing evidence which documented her ability to attend online classes and complete homework. Again, the record perhaps supports two conclusions and perhaps not, but the impetus here was on the ALJ, not the Court, to weigh the neuropsychological testing results in the first instance. Remand is therefore also appropriate for the ALJ to do so.

The parties also dispute the sufficiency of the ALJ's reliance on Plaintiff's ADLs, including swimming, jogging, ability to lift a 45 pound child, folding laundry, preparing simple meals, grocery shopping, drawing, and painting. The ALJ cited exhibit 2F/5 (AR 418) for the proposition that Plaintiff had been swimming all summer in her pool at her house, in Millerton lake, and in the Yosemite Merced river. The ALJ did ask Plaintiff about those notations in her treatment records and Plaintiff explained that the pool was a kiddie pool that goes up to her knees, that she doesn't know how to swim, that she stays in the shallow areas at the lake and the river, and that someone is always watching her.[8] AR 48, 81. Though it is commendable that the ALJ gave Plaintiff an opportunity to explain a potentially unfavorable notation in the treatment records, the ALJ

---

[8] In summarizing this testimony, Defendant stated without elaboration that "she *denied* swimming in the pool, lake, and river over the summer . . ." Resp. at 5 (emphasis added), which is not an entirely balanced encapsulation of the record as Plaintiff did not deny her presence in those bodies of water, just that she was not "swimming" per se.

disregarded the responses without explanation. Plaintiff's explanation was not implausible. "Swimming" in common parlance can indeed simply refer to one's presence in a pool or a lake, not the exertional act of treading water or performing common swimming strokes to keep one's body afloat. Plaintiff denied that she knew how to swim, she did not deny that she was physically present in those bodies of water. Further, the treatment note referencing "swimming" was a visit for symptoms of an ear infection, and swimming in a lake and river were ostensibly cited as potential causes for the infection. AR 418. That was probably all the context the medical provider needed for his/her purposes. That treatment note therefore does not necessarily undermine Plaintiff's testimony.

The ALJ also noted Plaintiff was jogging in January 2020 according to the treatment records. AR 25, 400, 708. As discussed above, Plaintiff did not specifically contest the ALJ's findings with respect to her knees, so it is not relevant whether her jogging activity was inconsistent with her alleged knee pain. Plaintiff here has not preserved a claim regarding her knee pain or associated limitation. To the extent the ALJ intended to cite jogging as an activity inconsistent with Plaintiff's headaches, seizures, and cognitive limitations, the reasoning is improper as there is no established connection between these activities and the alleged limitations. Further, the cited records from January 2020 pre-date the application date of May 15, 2020, and are therefore outside the relevant period.

Plaintiff's ability to lift her 45-pound younger sibling is reasonably supportive at least of Plaintiff's ability to perform medium exertional lifting (up to 50 pounds), and Plaintiff does not contend otherwise. But again, the only related impairment would be Plaintiff's knee impairment which the ALJ found had largely resolved, and again, a finding Plaintiff does not contest.

The ALJ also cited that "in September 2020, she *contemplated* playing softball in college" but she decided against it. AR 24 (emphasis added). Importantly, that doesn't suggest she could do so.

The remaining activities, folding laundry, preparing simple meals (specifically, a sandwich) grocery shopping with her mother, drawing, and painting, are not a sufficient basis to discredit Plaintiff's subjective testimony because they do not contradict Plaintiff's statements about the severity of her symptoms, nor do the cited activities suggest she could perform a substantial part of her day engaged in activities transferable to a work setting. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (explaining that An ALJ can rely on a claimant's daily activities as a basis for discrediting a claimant's testimony if (1) the daily activities contradict the claimant's other testimony; or (2) "a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." ).

### VI.     New Evidence Submitted to the Appeals Council

#### 1.     Applicable Law

No later than five business days before the date of the hearing, a claimant must submit all written evidence to the administrative law judge who will conduct the hearing in the claimant's case. 20 C.F.R. § 416.1435(a). The ALJ may also accept information after the five-day deadline prior to issuing the hearing decision under circumstances enumerated in 20 C.F.R. § 416.1435(b).

In limited circumstances, a claimant may submit new and material evidence to the Appeals Council that relates to the period on or before the ALJ's decision. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012); 20 C.F.R. § 416.1470(a)(5). Evidence is material if it bears "directly and substantially on the matter in dispute," and there is a "reasonable possibility" that the new evidence would have changed the outcome. 20 C.F.R. § 404.970; *Tudor v. Saul*, 484 F. Supp. 3d 717, 726 (N.D. Cal. 2020) (citing *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir.

2001)).

### 2. **Analysis**

Plaintiff submitted a letter to the Appeals Council dated May 3, 2022 from her neurology nurse practitioner, CPNP Bradley who stated as follows:

> Adel J. Quiroz (7/14(2000) has been followed. by multiple neurologists at Valley children's Neurology Clinic since July of 2014. We have failed to control her seizures with multiple. medicate ns as well as Vagus Nerve Stimulator: implantation (November 2020): Lab work done in our lab and at an outside ER indicate compliance with medications.
>
> She continues to have seizures every few months, convulsive as well as absence. The true frequency is unclear as her absence [seizures] are less obvious. She has significant memory and cognitive processing issues as reported by [Ms. Quiroz] herself and confirmed on neuropsychological testing in 2020….
>
> At this time [Ms. Quiroz] is not able to work due to her inability to drive as well as the unpredictable nature of her epilepsy….[S]he requires the assistance of family members to ensure her safety and she cannot work.

(AR 11).

The Appeals Council found there was no reasonable probability it would change the outcome. AR 2.

To the contrary, the letter easily satisfies the standard set forth above. It bears directly and substantially on the matter in dispute, namely whether Plaintiff's seizures were controlled by the VNS implant. It also presents a reasonable probability that the result would be different had the ALJ reviewed the letter. The ALJ found Plaintiff's seizures largely resolved after the November 9, 2020 VNS implant and relied on one January 2021 treatment note in support, however the April 2021 treatment note suggested otherwise. The May 2022 letter from CPNP Bradley is another piece of evidence suggesting the seizures did not largely resolve after VNS implant.

Defendant's argument to the contrary is unpersuasive. Defendant, like the ALJ, places undue emphasis on a January 6, 2021 treatment note indicating she was "doing well" post operatively, which is unavailing for the same reasons discussed above. Resp. at 15.

More concerningly, Defendant selectively quotes another progress note from November 2020 (AR 724), which also stated she was doing well post-operatively, but goes on to say in the same paragraph:

> She has been doing well without any fevers chills sweats or problems with the incision. She does notice a little bit of soreness with swallowing that has been improving and some soreness in her surgical sites particularly the lower one but this is also improved. She also notices some itching of her incisions.

Clearly, the reference to "doing well" refers to incision site healing and lack of complications, infection, or fever.  More importantly, the very same page also notes "doing well status post placement of vagal nerve stimulator. **Neurology to turn on device next week.**" (AR 724) (emphasis added).  This refutes any suggestion that "doing well" post-operatively refers to the efficacy of the device, as opposed to the lack of surgical complications.  The device <u>was not yet turned on</u> and thus could not have possibly been controlling Plaintiff's seizures.

Defendant further contends that CPNP Bradley improperly "relies on a neuropsychological test from 2020 that pre-dated the implantation of the vagal stimulator." Resp. at 15.  Defendant's argument is predicated on an assumption (without evidentiary support) that the VNS stimulator corrected, was intended to correct, or was capable of correcting cognitive impairments, rather than preventing myoclonic seizures.

Defendant further disputes that "Ms. Bradley stated in the second paragraph that the frequency of Plaintiff's seizures is 'unclear,'" which Defendant contends "contradicted Plaintiff's own hearing testimony that her seizures occurred once every three months." *Id.* (citing 58).  However, this conflates Plaintiff's grand mal (or general tonic-clonic, GTC) seizures with absence seizures (blank stares) and smaller myoclonic jerks and tremors.  This is made clear as the very page of the transcript Defendant cites explains the difference between each.  Plaintiff testified she has grand-mal seizures once every three months.  The record reflects she had the smaller myoclonic jerks as often as daily (AR 722, 1114) and it doesn't appear there is any evidence pinpointing the

frequency of the absence seizures (blank stares). And that was precisely the point CNPC Bradley was making, namely that "the true frequency is unclear as her absence [seizures] are less obvious." She was not commenting on the frequency of grand mal seizures. Thus this is not inconsistent with Plaintiff's reported seizure frequency.

Finally, Defendant takes issue with CNPC Bradley opining on the ultimate issue of disability, and goes on at length that this is a legal determination reserved for the Commissioner, that the ALJ has no obligation under the regulations to address statements on that issue, that such statements impermissibly seek to direct the Commissioner's ultimate decision on disability or blindness, that those statements are neither valuable nor persuasive, that the regulations therefore direct that ALJ's not be required to provide any analysis of such statements, and that doing so would be contrary to the regulations. Resp. at 16 (citing 20 C.F.R. § 416.920b(c)(3)).

However, Plaintiff has not suggested otherwise. It is not reasonable to reject the entirety of a statement from a medical source solely because the source opines on the ultimate issue of disability. The ALJ should consider CPNP Bradley's letter (AR 11) on remand, specifically the <u>first and second paragraphs thereof which directly address whether Plaintiff's seizures were controlled by the VNS implantation</u>. The ALJ need not address the third paragraph or explain that it impermissibly opines on the ultimate issue of disability.

**VII. <u>Conclusion and Order</u>**

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion. Accordingly, it is ordered that the Commissioner's decision is reversed, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff Ariel Quiroz and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:     **November 5, 2023**                                    **/s/ Gary S. Austin**
                                                                                      UNITED STATES MAGISTRATE JUDGE